1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PEO EXPERTS CA, INC., dba BIXBY            No. 2:17-cv-00318-KJM-CKD
     ZANE INSURANCE SERVICES, a
12   California corporation,

13                     Plaintiff,               ORDER

14        v.

15   MICHAEL CRAIG ENGSTROM, an
     individual; CHRISTOPHER IGNAZIO
16   LONGO, an individual; RYAN
     WAKEFIELD, an individual; JENNIFER
17   ENGSTROM, an individual; MICHAEL
     ENGSTROM, INC., a California
18   corporation; B&C LOC, INC., a California
     corporation; PEO ADVISORS OF CA,
19   INC., a California corporation; and
     FREEDOM RISK INSURANCE
20   SERVICES, a business entity form
     unknown,
21
                       Defendants.
22

23              Plaintiff PEO Experts CA, Inc., doing business as Bixby Zane Insurance Services

24   ("Bixby"), sues a former sales manager and two sales agents, as well as their respective

25   businesses and family, for allegedly misappropriating Bixby's trade secrets.  Bixby moved for a

26   preliminary injunction barring defendants' continued misappropriation of those secrets, which

27   defendants opposed.  After holding a hearing on the motion, and for the reasons discussed below,

28   /////

                                                  1

1   the court GRANTED a limited injunction against the sales manager and his company only, for

2   reasons explained in full below.

3   I.        <u>PROCEDURAL BACKGROUND</u>

4          Bixby filed this case on February 14, 2017, asserting the following claims against

5   all defendants: (1) Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets

6   Act ("DTSA" or "the Federal Act"), 18 U.S.C. § 1836; (2) Misappropriation of Trade Secrets in

7   Violation of the California Uniform Trade Secrets Act ("CUTSA" or "the Uniform Act"), Cal.

8   Civ. Code §§ 3426–3426.11; (3) Breach of Confidence; (4) Breach of Fiduciary Duty and Duty of

9   Loyalty; (5) Tortious Interference with Economic Relations; (6) Conversion; (7) Civil

10   Conspiracy; and (8) Unfair Competition in Violation of Cal. Bus. & Prof. Code §§ 17200–17209.

11   Compl. ¶¶ 39–102, ECF No. 1.

12          On February 24, 2017, the court denied Bixby's ex parte application for a

13   temporary restraining order.  Mot. TRO, ECF No. 4; Feb. 24, 2017 Hr'g Mins., ECF No. 18.  The

14   court ordered the parties to meet and confer regarding expedited discovery and set a preliminary

15   injunction hearing.  *See* ECF Nos. 18, 21, 23.

16          On March 30, 2017, Bixby filed its motion for a preliminary injunction.  Motion

17   Mem. P. & A. ("Mot."), ECF No. 32-1.  Defendants opposed.  Wakefield Opp'n, ECF No. 34;

18   Engstrom and Longo Opp'n, ECF No. 35.  Bixby filed a reply.  Reply, ECF No. 37.  The court

19   held a hearing on the motion on April 27, 2017, at which Alden Parker appeared for Bixby; Jason

20   Smith[1] and Matt Breining appeared for defendants Ryan Wakefield and his company; and Eric

21   /////

22   /////

23

24        [1] Bixby asks that Smith withdraw from representing Wakefield on the grounds that his declaration violates the advocate-witness rule.  Pl.'s Objs. No. 1, ECF No. 37-1 (citing Smith

25   Decl. Ex. A, ECF No. 35-1).  In response, Wakefield asks that Bixby's counsel withdraw for engaging in similar conduct at the TRO stage.  Wakefield's Suppl. Br., ECF No. 45 (citing Parker

26   Suppl. Decl. ¶ 3, ECF No. 15).  At this preliminary stage, the court finds neither attorney is likely

27   to testify at trial, so withdrawal is unwarranted.  *United States v. Prantil*, 764 F.2d 548, 552–53 (9th Cir. 1985); ABA Model Rule 3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness[.]").

28

1    Graves and Jeff Stone appeared for defendants Michael Engstrom, Jennifer[2] Engstrom, Chris

2    Longo, and their respective companies.  April 27, 2017 Hr'g Mins., ECF No. 41.

3            At hearing, the court indicated it would grant the preliminary injunction in part,

4    *id.*, and the parties filed supplemental briefs addressing whether a bond should be required, ECF

5    Nos. 42–43.  On May 19, 2017, the court issued a short order granting the preliminary injunction

6    in part as to Wakefield and Freedom Risk Insurance Services only and requiring Bixby to post a

7    bond in the amount of $5,000.  ECF No. 50.  The court explained it would fully explain the

8    reasons for its decision in a subsequent order, and it does so here.

9    II.    FACTUAL BACKGROUND

10           "A plaintiff seeking a preliminary injunction must establish that he is likely to

11    succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

12    relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."

13    *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Bixby relies exclusively on

14    defendants' alleged misappropriation of its trade secrets to support its motion, *see* Mot. at 17–25,

15    and the court focuses on the likelihood of success of Bixby's trade secrets claims.  With these

16    considerations in mind, the court provides the facts most relevant to Bixby's motion below.

17           A.    Bixby Zane Insurance Services

18           Founded in 2003, Bixby helps small-to-medium-sized businesses address the

19    administrative burdens and costs of workers' compensation, payroll and taxes, employee benefits

20    and management, and regulatory compliance.  Crawford Decl. ¶ 2, ECF No. 32-2.  Bixby helps its

21    clients find these services from Professional Employer Organizations ("PEOs").  *Id.* ¶ 3;

22    Crawford Dep. at 15:24–16:7[3] (describing Bixby as a "wholesaler" for services to PEOs).

23    Bixby's clients purchase services generally through renewable one-year contracts.  Engstrom

24    Decl. ¶ 2, ECF No. 35-3.

25           [2] Any reference to "Engstrom" alone is to Michael Engstrom.

26           [3] The parties both filed deposition excerpts on the court's docket.  *See* Parker Decl. Exs.
27    1–5, ECF No. 32-5; Graves Decl. Exs. 1–3, ECF Nos. 35-6–8.  Because the court relies on
      portions lodged by e-mail with the court that were never docketed, and for consistency's sake, the
28    court cites the deposition page numbers only.

3

Bixby asserts its "most valuable relationship" in California is with Workforce

Business Services, Inc. ("WBS"), a PEO that bundles services and insurance into packages that

target the heavy construction industry.  Mot. at 8; *see* Crawford Decl. ¶ 30; Worley Dep. at

25:22–23; Engstrom Decl. ¶ 2; Wakefield Decl. ¶ 31 (estimating WBS makes up 80% of Bixby's

business).  The record does not make clear whether Bixby has an exclusive relationship with

WBS or, even if it does, whether the agreement is in writing.  *See* Crawford Decl. ¶ 30; Crawford

Dep. at 17:22–25; Worley Dep. at 22:10–13, 22:4–6, 22:17–20; Wakefield Dep. at 96:15–16;

Engstrom Dep. at 57:9–13; Wakefield Decl. ¶ 28, ECF No. 34-3; Smith Decl. Ex. A, ECF

No. 35-1.  In any event, construction companies and contractors use Bixby as an intermediary to

purchase WBS's bundled services, and WBS pays Bixby a commission for the business it places

with WBS.  Engstrom Decl. ¶ 2.

Since 2003, Bixby has spent "substantial resources" developing a list of clients,

such as construction companies, and partner vendors, such as WBS; Bixby considers the list a

trade secret.  Compl. ¶ 42; *see also* Mot. at 8–9.  The allegedly secret information includes:

clients' identities, contact information, pricing information, prior purchase history, product

preferences and habits.  Compl. ¶ 42.  It also includes commission information, such as the

amount WBS pays Bixby for the business it brings.  *Id.*

　　　　B.　　Ryan Wakefield's Employment at Bixby

Defendant Ryan Wakefield began working for Bixby as a commissioned sales

person in April 2008 and signed an employment agreement that same month.  Wakefield Decl.

¶ 4; *id.* Ex. A (Employment Agreement), ECF No. 34-3.  The employment agreement included

several restrictive covenants, including a "Covenant Not to Use or Disclose The Company's

Trade Secrets."  Employment Agreement at 4 ¶ 5(a).  In October 2008, Wakefield left Bixby and

formed and operated his own insurance company entitled "Wakefield Insurance Services."  *Id.* ¶¶

6–7.  Wakefield rejoined Bixby in the fall of 2009 as a sales manager with a salary, commission

and percentage of profits, and was tasked with managing independent sales agents including

defendants Michael Engstrom and Chris Longo.  *Id.* ¶¶ 8, 12.  When Wakefield rejoined in 2009,

4

1    Bixby did not ask him to sign any restrictive covenant such as a confidentiality agreement or non-

2    disclosure agreement.  *Id.* ¶ 9.

3              On February 6, 2017, Bixby principal Brad Worley told Wakefield that Wakefield

4    would no longer manage Bixby's day-to-day affairs.  *Id.* ¶ 20.  Around this time, Wakefield

5    renamed his company Freedom Risk Insurance Insurances ("Freedom Risk"), which is also

6    named as a defendant in this case.  Wakefield Dep. at 26:10–22, 63:4–10, 63:15–20.  On

7    February 7 or 8, 2017, Wakefield resigned.  Wakefield Decl. ¶ 21; Crawford Decl. ¶ 18.

8              Within weeks after leaving Bixby, Wakefield approached representatives from

9    three PEOs with which Bixby works to discuss doing business with his company.  Wakefield

10   Dep. at 63:21-65:22, 71:22–23 (describing communications with Insured Solutions, Decisions

11   HR, and WBS).  In particular, Wakefield submitted a proposal to WBS that included commission

12   details based, in part, on his memory of a similar plan he developed for Bixby principal Jason

13   Crawford.  *Id.* at 66:17–21, 67:3–6.  Based partially on this conduct, Bixby now asks the court to

14   enjoin Wakefield from using Bixby's trade secrets to solicit business from its clients and partners.

15        C.    Michael Engstrom's and Chris Longo's Employment at Bixby

16             Defendants Michael Engstrom and Chris Longo began working for Bixby in 2011

17   and 2010, respectively.  *See* Engstrom Decl. ¶ 2.  Although initially hired as Bixby employees,

18   starting in 2013 Engstrom and Longo worked as independent contractors through their own

19   corporations, defendants Michael Engstrom, Inc. ("MEI") and B&C Loc, Inc. ("B&C").

20   Engstrom Suppl. Decl. ¶ 4, ECF No. 11-2; Longo Suppl. Decl. ¶ 3, ECF No. 11-1.

21             In late 2016, Engstrom and Longo settled a dispute with Bixby over unpaid

22   commissions.  In short, Bixby reduced Engstrom and Longo's 2013 commissions during WBS's

23   "cash crunch," but did not restore the commissions when WBS's rates increased in 2015.

24   Engstrom Decl. ¶ 5; Longo Decl. ¶ 4, ECF No. 35-2.  In July 2016, Engstrom and Longo sought

25   reimbursement for approximately $500,000 in commissions they asserted Bixby withheld from

26   them.  *Id.*[4]  As part of their settlement negotiations, Bixby sent each a written Independent

27   ───────────────

28   [4] During this conflict, Engstrom and Longo reached out to Engstrom's long-term
     acquaintance, Javier De Haro, Vice President of Loss Control at Client Services Specialists, a

1   Contractor Agreement; Engstrom and Longo each refused to sign due to their "onerous"

2   restrictive covenants.  Engstrom Decl. ¶ 6 ("[T]he definition of Bixby's 'confidential information'

3   in the [Agreement] was so broad that it could be interpreted to include my clients and contacts.");

4   *id.* Ex. A (Independent Contractor Agreement), ECF No. 35-3.  Bixby nonetheless settled in

5   December 2016 and paid the withheld commissions.  *See id.* Ex. C (Settlement Agreement), ECF

6   No. 35-3; Longo Decl. Ex. B (same), ECF No. 35-2.

7           On January 18, 2017, Bixby principal Jason Crawford emailed Engstrom advising

8   him to transition his clients from the Bixby brand to Engstrom's own company, MEI.  Wakefield

9   Decl. Ex. B, ECF No. 34-3.  Crawford also explained that Wakefield was currently reviewing

10  Engstrom's active agents, and "[a]ny agent that you have written business with over the past two

11  calendar years will be added to a **reserved** list."  *Id.* (emphasis in original).  Although the parties

12  dispute whether the contacts on the "reserved" list belonged to Engstrom, they agree the list was

13  intended to include the brokers with whom Engstrom would continue to work in the future.  *See*

14  Engstrom Dep. at 44:9–13; Worley Dep. at 113:7–10; Crawford Dep. at 76:19–77:3.  On January

15  20, 2017, Wakefield e-mailed Engstrom a list of approximately eighty companies with whom

16  Engstrom had done business over the last five years.  Wakefield Decl. ¶ 16; *id.* Ex. C, ECF No.

17  34-3.  At hearing, Bixby contended Wakefield's list did not conform to Crawford's direction of

18  sending only a reserved list of "agents."  The record does not make clear which agents represent

19  which clients, so the court is unable to determine whether Wakefield sent Engstrom a list that was

20  materially different than the reserved list Crawford directed Wakefield to send.  The dispute is

21  immaterial, however; as the court discusses below, Engstrom likely had a proprietary interest in

22  the client lists he helped create, as did Longo.

23

24

25  WBS affiliate.  De Haro Decl. ¶ 5.  Bixby relied heavily on De Haro's declaration at the TRO
    stage to assert Engstrom and Longo asked De Haro to reach out to WBS owner Robert Kelly and

26  intended to dissolve Bixby's relationship with WBS.  *See* Mot. TRO at 13–15.  De Haro has since
    explained Engstrom and Longo never expressed an intent to dissolve Bixby's relationship with

27  WBS, De Haro Dep. at 36:19–21, never directly asked De Haro to reach out to Kelly, *id.* at
    41:17–44:13, and never talked about working with WBS after they settled their dispute with

28  Bixby, *id.*

On February 10, 2017, Bixby terminated its relationship with Engstrom and Longo.  Crawford Decl. ¶ 32.  Bixby did not send a termination letter or notice of separation, but deactivated Engstrom's and Longo's work e-mails.  Engstrom Suppl. Decl. ¶ 17.  Bixby also immediately began reaching out to brokers with whom Engstrom worked, including those on Engstrom's "reserved" list, to solicit their continued business.  *Id.* Ex. E, ECF No. 11-2 (e-mail from Bixby principals to broker for First Service Insurance Agents & Brokers, Inc.).  Bixby has not paid Engstrom and Longo their commissions since January 2017, including for work done before their termination.  Engstrom Decl. ¶ 10; Longo Decl. ¶ 7.

### D.   Jennifer Engstrom

Defendant Jennifer Engstrom also worked for Bixby as a sales consultant through her company, defendant PEO Advisors of CA, Inc. ("PEO Advisors").  Compl. ¶¶ 5, 9.  Bixby alleges her husband, Michael Engstrom, can access Bixby's trade secret information through a shared home office.  Jennifer Engstrom Dep. at 22:21–23.  Jennifer Engstrom has not worked for Bixby since late 2012 and has never had access to Bixby's password-protected databases.  *Id.* at 18:19–24, 19:2–7, 20:4–12, 21:4–15.  She has used shared workspace with her husband only to share family photos.  *Id.* at 22:24–23:4.

### III.   STANDARD FOR PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24, and "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)).  As provided by Federal Rule of Civil Procedure 65, a court may issue a preliminary injunction to preserve the relative position of the parties pending a trial on the merits.  *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).  As noted, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (2008).

1    The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test."

2    *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).  That formulation is referred to as the

3    "serious questions" or the "sliding scale" approach: "'serious questions' going to the merits and a

4    balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

5    injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

6    that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

7    1127, 1135 (9th Cir. 2011); *see also id.* at 1131–32 ("[T]he 'serious questions' approach survives

8    *Winter* when applied as part of the four-element *Winter* test.").  Under the "serious questions"

9    approach to a preliminary injunction, "[t]he elements of the preliminary injunction test must be

10    balanced, so that a stronger showing of one element may offset a weaker showing of another."

11    *Lopez*, 680 F.3d at 1072; *Clear Channel Outdoor, Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir.

12    2003).  "At an irreducible minimum, though, the moving party must demonstrate a fair chance of

13    success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*,

14    670 F.3d 1096, 1105–06 (9th Cir. 2012) (internal quotation marks and alteration omitted).  And

15    "[u]nder any formulation of the test, the moving party must demonstrate a significant threat of

16    irreparable injury." *Arcamuzi v. Contl. Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987).

17    In ruling on a preliminary injunction, the court may rely on declarations, affidavits

18    and exhibits, among other things. *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009); *see*

19    *also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) ("The trial court may give

20    even inadmissible evidence some weight, when to do so serves the purpose of preventing

21    irreparable harm before trial.").  Such evidence need not conform to the standards for a summary

22    judgment motion. *Bracco v. Lackner*, 462 F. Supp. 436, 442 n.3 (N.D. Cal. 1978).  "The urgency

23    necessitating the prompt determination of the preliminary injunction; the purpose of a preliminary

24    injunction, to preserve the status quo without adjudicating the merits; and the [c]ourt's discretion

25    to issue or deny a preliminary injunction are all factors supporting the considerations of

26    affidavits." *Id.*  "The weight to be given such evidence is a matter for the [c]ourt's discretion,

27    upon consideration of the competence, personal knowledge and credibility of the affiant." *Id.*; *see*

28    *also Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985).

1  IV.    DISCUSSION

2         A.    Likelihood of Success

3                The court focuses on the likelihood of success of Bixby's claims under California

4  and federal trade secrets law.  *See Engility Corp. v. Daniels*, 16-CV-2473-WJM-MEH, 2016 WL

5  7034976, at *8 (D. Colo. Dec. 2, 2016) (discussing only trade secrets claims based on plaintiff's

6  limited briefing).

7                     1.    Trade Secrets Generally

8                California has adopted the Uniform Trade Secrets Act, which codifies the basic

9  principles of common law trade secret protection.  *MAI Sys. Corp. v. Peak Computer, Inc.*,

10  991 F.2d 511, 520 (9th Cir. 1993) (citing Cal. Civ. Code §§ 3426–3426.10).  To establish a

11  violation, a plaintiff must show the defendant was unjustly enriched by the "misappropriation" of

12  a "trade secret."  *American Credit Indem. Co. v. Sacks*, 213 Cal. App. 3d 622, 630 (1989); *see*

13  *also AccuImage Diagnostics Corp v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 950 (N.D. Cal. 2003)

14  (describing these as the Act's "two primary elements").

15                A "trade secret" is "information, including a formula, pattern, compilation,

16  program, device, method, technique, or process, that: (1) Derives independent economic value,

17  actual or potential, from not being generally known to the public or to other persons who can

18  obtain economic value from its disclosure or use, and (2) Is the subject of efforts that are

19  reasonable under the circumstances to maintain its secrecy."  Cal. Civ. Code § 3426.1(d).  In

20  other words, the information "is valuable because it is unknown to others."  *DVD Copy Control*

21  *Assn. v. Bunner*, 116 Cal. App. 4th 241, 251 (2004).

22                The Uniform Act defines "misappropriation" as the acquisition of a trade secret by

23  "improper means," which includes "theft, bribery, misrepresentation, breach or inducement of a

24  breach of a duty to maintain secrecy."  Cal. Civ. Code § 3426.1(b)(1); *id.* § 3426.1(a).

25  "Misappropriation" also means disclosure or use of a trade secret without the owner's consent.

26  *Id.* § 3426.1(b)(2).  "Use" includes soliciting customers through the use of trade secret

27  information.  *PMC, Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000).

28

9

1    At the federal level, Congress recently enacted the Defend Trade Secrets Act to

2  "provide Federal jurisdiction for the theft of trade secrets."  *See* DTSA of 2016, Pub. L.

3  No. 114-153, 130 Stat. 376 (DTSA) (codified in scattered sections of title 18 of the United States

4  Code).  Similar to the Uniform Act, the Federal Act permits the "owner of a trade secret that is

5  misappropriated" to bring a civil action, 18 U.S.C. § 1836(b), and includes substantially similar

6  definitions of "trade secret" and "misappropriation," *see* 18 U.S.C. § 1839(3); *id.* § 1839(5).  The

7  Federal Act applies to any misappropriation that occurs on or after May 11, 2016.  DTSA,

8  18 U.S.C. § 1833 note.

9    The parties do not assert any material difference between the Federal and Uniform

10  Acts.

11    2.    Bixby's Trade Secrets

12    As noted, Bixby defines its trade secrets to include: customer identities, especially

13  of Bixby's top customers; customer contact information; customers' pricing information, prior

14  purchase history, specifications, and habits; and other forms of customer goodwill.  Compl. ¶ 42;

15  *see also* Mot. at 8–9.  Customer information, including identities and preferences, can be a trade

16  secret.  *Continental Car-Na-Var Corp. v. Moseley*, 24 Cal. 2d 104, 110–11 (1944); *MAI Sys.*

17  *Corp*, 991 F.2d at 521.  However, "where the customers['] . . . names appear in directories, and

18  they are so few in number that anyone might readily discover them, it has been held that the

19  employer's list is not secret and confidential information."  *George v. Burdusis*, 21 Cal. 2d 153,

20  159 (1942).  "As a general principle, the more difficult information is to obtain, and the more

21  time and resources expended by an employer in gathering it, the more likely a court will find such

22  information constitutes a trade secret."  *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 1522

23  (1997).

24    Since its founding in 2003, Bixby has spent significant time and resources

25  developing a list of clients and vendors as well as marketing strategies, pricing histories and

26  contact information for both groups.  Crawford Decl. ¶¶ 2, 5, 35.  Because Bixby operates as an

27  intermediary between client end-users and its partner PEOs, Bixby's information regarding prices

28  for clients and commission structures with PEOs "forms the very foundation" of Bixby's success

10

1  in a competitive market.  Crawford Decl. ¶ 6.  For the purposes of this motion, the court is

2  satisfied that Bixby has sufficiently identified compilations of information that "derive[]

3  independent economic value, actual or potential, from not being generally known to the public."

4  Cal. Civ. Code § 3426.1(d)(1); *see Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079,

5  1089 (E.D. Cal. 2012) (finding, although publicly available customer identity and contact

6  information by itself may not be a trade secret, plaintiff's "comprehensive, if not encyclopedic,

7  compilation of customer, operator, and vendor information" was protectable trade secret).

8      Bixby also has taken reasonable steps to maintain the secrecy of its trade secret

9  information.  Bixby has retained Salesforce.com, Inc. ("Salesforce") to encrypt and compile

10  Bixby's confidential insurance services data.  Crawford Decl. ¶ 7.  Bixby maintains the

11  Salesforce information on a password-protected Google drive and provides employees with

12  access to this information on a "need to know" basis.  *Id.* ¶¶ 7–10.  Consistent with that approach,

13  Bixby gave Engstrom and Longo access only to information for the accounts they managed.

14  *Id.* ¶ 8.

15      At the same time, defendants fairly point out that Bixby lacks operative

16  nondisclosure agreements from each defendant or even from its data security consultant.

17  Wakefield Decl. ¶ 9; Engstrom Decl. ¶ 4; Longo Decl. ¶ 3; Lee Dep. at 14:17–21, 30:13–15.

18  Courts often look to nondisclosure agreements to evaluate a party's reasonable efforts to maintain

19  secrecy.  *See MAI Systems*, 991 F.2d at 521 (confidentiality agreement supported "reasonable

20  efforts"); *see also* David S. Almeling et. al., *A Statistical Analysis of Trade Secret Litigation in*

21  *Federal Courts*, 45 Gonz. L. Rev. 291, 322 (2009) (analyzing several hundred cases and

22  concluding courts are far more likely to find "reasonable efforts" if employee signed

23  confidentiality agreement).  Bixby does ordinarily obtain these kinds of agreements from

24  employees.  Crawford Decl. ¶ 10.  As noted, Bixby obtained an employment agreement with

25  several restrictive covenants from Wakefield when he began working for Bixby in 2008,

26  Wakefield Decl. ¶ 3, and asked Engstrom and Longo to sign an agreement with restrictive

27  covenants before they allegedly misappropriated Bixby's trade secrets, Engstrom Decl. ¶ 6;

28  Longo Decl. ¶ 5.  Fundamentally, however, a confidentiality agreement is not an absolute

1   prerequisite to trade secret protection. *See Alex Foods, Inc. v. Metcalfe*, 137 Cal. App. 2d 415,

2   427 (1955) ("Independent of an express contract, equity will enjoin the disclosure of confidential

3   knowledge of trade secrets which a former employee learned in the course of his employment.");

4   Almeling, *supra*, at 323 ("Other measures can make up for the lack of an agreement, and courts

5   can find an implied agreement based on the circumstances."). "A business is not required to turn

6   itself into an 'impenetrable fortress' to protect its trade secrets." *Pyro Spectaculars*, 861 F.Supp.

7   2d at 1092.

8          For the purposes of this motion, and for all the reasons discussed in this order, the

9   court finds Bixby's trade secret information was likely "the subject of efforts that are reasonable

10  under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d); *Pyro Spectaculars*,

11  861 F. Supp. 2d at 1092 (finding, although plaintiff's "security practices are not perfect," issues

12  could be further explored in discovery and at trial, and plaintiff's efforts were sufficiently

13  reasonable to support preliminary injunction); *Amedisys Holding, LLC v. Interim Healthcare of*

14  *Atlanta, Inc.*, 793 F. Supp. 2d 1302, 1311 (N.D. Ga. 2011) (finding company's practice of

15  restricting access to documents designated as confidential to certain employees and limiting

16  document transmittals to protected computer and email systems showed company took reasonable

17  efforts to maintain document confidentiality).

18          In sum, Bixby will likely succeed in showing its pricing and commission

19  information regarding its clients and vendors "is valuable because it is unknown to others," *DVD*

20  *Copy Control*, 116 Cal. App. 4th at 251, in that the information "derives independent economic

21  value" and is subject to "reasonable efforts" to protect its secrecy, Cal. Civ. Code § 3426.1(d).

22  Bixby has sufficiently shown a trade secret exists to support its motion here.

23              3.    Wakefield's Misappropriation

24          To support its misappropriation claim, Bixby argues Wakefield solicited Bixby's

25  clients and its partner PEOs using Bixby's trade secrets. Mot. at 20. The record shows:

26  (1) Wakefield spoke with representatives of three PEOs, including WBS, to discuss a relationship

27  with his new business, Wakefield Dep. at 63:21–65:22; (2) Wakefield copied Bixby's trade secret

28  information onto a new personal computer, Wakefield Dep. at 18:13–16, 67:18–20; Wakefield

Decl. ¶ 24; and (3) Wakefield sent a "loss run"[5] to the broker of a Bixby client, K2 Demolition, Wakefield Dep. at 79:24–80:3; Wakefield Decl. ¶ 23.  As discussed below, only Bixby's first allegation of misappropriation supports its motion.

Bixby's strongest case for misappropriation concerns Wakefield's post-resignation communication to Bixby's partner PEOs.  In the weeks following his departure from Bixby, Wakefield spoke with Eric Stein of Insured Solutions, Chris Borrega of Decisions HR, and Robert Kelly and Dan Johnson of WBS.  Wakefield Dep. at 63:21–65:22, 71:22–23.  Wakefield's one-off conversations with Stein and Borrega were preliminary, *id.* at 64:21–24, but his discussions with WBS went further:  Wakefield had several conversations and e-mail exchanges with WBS's owner and counsel.  *Id.* at 65:11–66:4, 71:12–19.  Through these conversations, Wakefield proposed a commission plan for WBS's consideration.  *Id.* at 66:17–21.  Wakefield admits he partially based the plan's details on what he remembered from a plan he developed for Crawford while still at Bixby.  *Id.* at 67:3-6.  But Bixby did not push Wakefield for further details about the plan at deposition, *see id.* 65:11–66:4, 66:17–21, 67:3–6, 71:12–19, and no independent documentation of the proposal is before the court.

Even if Wakefield did not access Bixby's confidential rates and prices on his personal computer to prepare for his discussions with WBS, *id.* at 67:21–23, the court can infer he likely used that information to craft his proposal, especially given the short time between his departure from Bixby and these conversations.  *Cf. Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 973 (9th Cir. 1991) ("As a practical matter, it would be difficult for a person developing the same technology for two clients not to use knowledge gained from the first project in producing the second.").  Because Wakefield was privy to this information only through his prior work as a Bixby employee, this fact could be enough to support Bixby's misappropriation claim.  *JustMed, Inc. v. Byce* (*Byce*), 600 F.3d 1118, 1130 (9th Cir. 2010) (explaining that soliciting customers through the use of trade secret information constitutes misappropriation);

---

[5] A "loss run" is a document that records the history of claims against a commercial insurance policy.  *See* https://en.wikipedia.org/wiki/Loss_run.  In California, an insurer must provide a "premium and loss history report" to a requesting party if the policy is cancelled or not renewed.  Cal. Ins. Code § 679.7(a).

1    *Reid v. Mass Co.*, 155 Cal. App. 2d 293, 302 (1957) ("[It is not necessary to show that the

2    employee actually used [a customer list] if he carried it in his mind or memory."); *see also Ed*

3    *Nowogroski Ins., Inc. v. Rucker*, 137 Wash. 2d 427 (1999) (holding trade secret did not lose its

4    protected status when committed to memory rather than writing).  At the very least, the court

5    finds a "serious question" regarding Wakefield's misappropriation that supports a preliminary

6    injunction here.  *Alliance for the Wild Rockies*, 632 F.3d at 1135.

7              Bixby's remaining allegations do not increase its likelihood of success.  As to

8    Bixby's second allegation, Bixby cannot show Wakefield misappropriated its trade secret

9    information by copying it from one computer to another:  Wakefield already had this information

10   on a computer he regularly used for personal and business purposes, Wakefield Decl. ¶ 24, and

11   thus could not "acquire" it for section 3426.1(b)(1) purposes.  *See Byce*, 600 F.3d at 1129 (9th

12   Cir. 2010) ("Byce did not 'acquire' the source code through improper means because he already

13   had possession of it as an employee.").  Merely copying trade secret information also does not

14   constitute "use" under section 3426.1(b)(2), because copying does not affect the value of the trade

15   secrets or otherwise enrich Wakefield.  *Id.* at 1130 (citing Restatement (Third) of Unfair

16   Competition § 40 (1995) com. c) ("The term 'use' . . . generally contemplates some type of use

17   that reduces the value of the trade secret to the trade secret owner.").  In these circumstances,

18   Bixby cannot likely show Wakefield misappropriated its information by copying it.

19             Bixby also has not shown Wakefield misappropriated Bixby's trade secrets when

20   he sent the loss run to K2 Demolition's broker  because no evidence in the record shows

21   Wakefield used any confidential information in the process.  Bixby has no record of Wakefield's

22   e-mail correspondence, Parker Suppl. Decl. ¶ 3(d), ECF No. 15, and the only evidence of this

23   communication is Wakefield's acknowledgement of the email, *see* Wakefield Dep. at 79:24–80:3,

24   Wakefield Decl. ¶ 23.  Bixby's bare assertion that Wakefield used its "confidential data" in this

25   way does not make success on its misappropriation claim likely.  Bixby does not dispute

26   Wakefield's contentions that the insurer, and not WBS, prepared the loss run, that the loss run

27   contains statutorily required boilerplate language, and that WBS had already issued the client a

28   non-renewal notice.  Wakefield Decl. ¶¶ 23, 30.  Nor does Bixby dispute that K2 Demolition's

1  contact information and renewal dates both are publicly available on the California Contractors

2  State License board website. *Id.* (citing www.cslb.ca.gov).  Because Bixby cannot likely show

3  Wakefield disclosed or used its trade secret information in sending the loss run, it will not likely

4  succeed in showing Wakefield's misappropriation on this basis.

5         In sum, Bixby presents a "serious question" regarding the likelihood of success of

6  its misappropriation claim on the basis of Wakefield's discussions with WBS.  But without

7  details of those discussions, the court cannot find Bixby is "likely to succeed on the merits."  The

8  court therefore addresses the remaining *Winters* factors below to determine whether to issue an

9  injunction as to Wakefield using the Ninth Circuit's "sliding scale" approach.  *Alliance for the*

10  *Wild Rockies*, 632 F.3d at 1135.  But first the court addresses Engstrom and Longo.

11         4.    Engstrom's and Longo's Misappropriation

12         At hearing, Bixby conceded the record does not support finding coordination

13  between Wakefield and the other defendants.  The court separately evaluates Bixby's

14  misappropriation claim as to Engstrom and Longo.

15         Bixby argues Engstrom and Longo misappropriated its trade secrets by

16  downloading client information from Bixby's Salesforce and Google Drive accounts and using

17  that information to solicit business from Bixby's clients and vendors after the two left Bixby.

18  Mot. at 2.  Engstrom and Longo argue they own the client lists—or "books of business"— Bixby

19  asserts they misappropriated.  Engstrom and Longo assert the customer lists are partially theirs

20  because they were independent contractors, they were personally invested in building the

21  customer list and because Bixby repeatedly told them they were the true account owners.

22  Engstrom and Longo Opp'n at 16–18.  Bixby contends the client information belongs to it

23  because it owns the fruits of Engstrom's and Longo's labor even after each became an

24  independent contractor.  Reply at 7–8.

25         Although California law presumes employers own property their employees

26  develop, independent contractors' property rights depend on the relevant employment agreement.

27  California law makes "[e]verything which an employee acquires by virtue of his employment,

28  except the compensation which is due to him," the property of the employer.  Cal. Lab. Code

§ 2860; *Reid v. Mass Co.*, 155 Cal. App. 2d 293, 300 (1957) ("A customer list built up by the employer over a period of years is his property, and its use by a former employee for his own advantage will be enjoined."). No such presumption exists for independent contractors, however, whose ownership rights are determined by the parties' agreement. *See Integrated Dynamic Sols., Inc. v. VitaVet Labs, Inc.*, 6 Cal. App. 5th 1178, 1181 (2016) (finding agreement expressly made independent contractor's services "work made for hire" and therefore employer's property). Courts often look to the parties' conduct to construe the employment relationship. *See, e.g.*, *Pollara v. Radiant Logistics Inc.*, CV 12-0344 GAF (SPX), 2013 WL 12113385, at *11 (C.D. Cal. May 30, 2013) (finding, despite defendants' independent contractor agreement, other documents and conduct could show that one defendant acted as the other's agent); *see also ICE Corp. v. Hamilton Sundstrand Corp.*, 432 F. App'x 732, 738, 738 n.1 (10th Cir. 2011) (although plaintiff was defendants' independent contractor, plaintiff owned certain trade secrets based on the parties' agreements and conduct). A sales agent's status as an independent contractor may support a finding that the agent owns the customer lists he helped develop. *See Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990) (customer lists were not plaintiff's trade secrets because defendant sales representative developed the information while an independent contractor).

Here, neither Engstrom nor Longo have any written agreement with Bixby, but "[t]he law does not favor but leans against the destruction of contracts because of uncertainty." *Patel v. Liebermensch*, 45 Cal. 4th 344, 349 (2008) (quoting *McIllmoil v. Frawley Motor Co.*, 190 Cal. 546, 549 (1923)). It is a "cardinal rule of construction that when a contract is ambiguous or uncertain the practical construction placed upon it by the parties before any controversy arises as to its meaning affords one of the most reliable means of determining the intent of the parties." *Sterling v. Taylor*, 40 Cal. 4th 757, 772 (2007) (quoting *Bohman v. Berg*, 54 Cal. 2d 787, 795 (1960)). The court's "fundamental goal" is to "give effect to the mutual intention of the parties." *Wolf v. Super. Ct.*, 114 Cal. App. 4th 1343, 1356–57 (2004) (citing, *inter alia*, *Bank of the W. v. Super. Ct.*, 2 Cal. 4th 1254, 1264–65 (1992)).

16

The totality of the evidence before the court indicates Engstrom and Longo have a proprietary interest in the books of business Bixby now claims as a trade secret.  Engstrom and Longo were solely responsible for expanding their books of business.  Engstrom Decl. ¶ 3; Longo Decl. ¶ 2.  In 2016 alone, Engstrom spent $50,000 and Longo spent $16,400 on non-reimbursed marketing expenses, including: office space rental; travel; lead lists; and meals, entertainment and gifts for clients.  Engstrom Decl. ¶ 3; Longo Decl. ¶ 2.  At hearing, Bixby's counsel conceded employees are not expected to independently invest in marketing expenses.  Engstrom and Longo never signed an independent contractor agreement, and they rejected Bixby's proposed agreement in late 2016 because the "confidential information" definition broadly included what Engstrom and Longo understood to be their independently obtained clients.  Engstrom Decl. ¶ 6; *id.* Ex. B; Longo Decl. ¶ 5.

Bixby regularly told Engstrom and Longo they were building their own books of business and contacts while working as independent contractors.  Engstrom Dep. at 77:16–78:6; Longo Dep. at 165:1–23 (discussing "hundreds" of occasions where Crawford, Worley or Wakefield represented the clients were Longo's); Wakefield TRO Decl. ¶ 19, ECF No. 13-1 (explaining Bixby regularly referred to Engstrom and Longo's customers as "your agents," "your brokers," "your contacts" or "your clients").  Bixby repeatedly told Engstrom and Longo if they continued to manage their accounts after they left Bixby, they would continue to receive residual commissions.  Engstrom Dep. at 77:16–78:6; Longo Dep. at 165:19–23.  Indeed, Bixby had done this for other independent sales agents in the past.  Worley Dep. at 130:1–7.  Bixby also had a practice of buying sales agents' books of business, and had done so at least twice.   Worley Dep. at 127:21–25; Wakefield TRO Decl. ¶ 19.  Months before his departure, Engstrom also suggested Bixby purchase his book of business, a suggestion Crawford did not reject.  Engstrom Dep. at 79:13–22.

Finally, when Bixby asked Engstrom to transition to his own branding in January 2017, Bixby told him he would receive a list of reserved clients, brokers and agents.  Engstrom Decl. ¶ 9.  The list Engstrom then received included all clients with whom he had done business in the last five years.  *Id.* Ex. D.  The list identifies approximately eighty "Opportunities" for what

1   appear to be construction companies; Engstrom is listed as the "Opportunity Owner" for each

2   entry and the "Account Owner" for most of them.  *Id.*  At the TRO stage, Engstrom and Longo

3   submitted similar lists of clients generated from Bixby's salesforce accounts that listed each of

4   them as the "Opportunity Owners" or also the "Account Owners."  Engstrom Suppl. Decl. Ex. B;

5   Longo Suppl. Decl. Ex. A.

6           In response to this compelling evidence, Bixby argues the court should nonetheless

7   treat Engstrom and Longo as employees for three reasons.  Mot. at 13–14.  First, Engstrom's and

8   Longo's process of acquiring client leads generally remained the same as when they were Bixby

9   employees.  *Id.*  But this argument ignores their change in status; after they transitioned to

10  become independent contractors in 2010 and 2011, the parties' agreement determined their

11  ownership rights.  *See Integrated Dynamic*, 6 Cal. App. 5th at 1181.  Second, Engstrom and

12  Longo continued to hold themselves out as Bixby employees.  Engstrom Dep. at 88:19–90:10,

13  73:3–74:18, 76:15–78:9.  But the record shows Bixby merely licensed its name and brand to

14  defendants for their independent contractor work.  *See* Engstrom Dep. at 77:16–20 (summarizing

15  Crawford's explanation that they essentially had a licensing agreement, and "[y]ou're licensing

16  the Bixby Zane name, letterhead, email, business cards"); Wakefield Decl. Ex. B (Crawford's e-

17  mail to Engstrom instructing him "to fully transition from the Bixby Zane brand to MEI").  Third,

18  Bixby argues it necessarily owns the customer list, but cites only inapplicable "hired to invent"

19  cases.  Reply at 8; *see Computer Associates Intern., Inc. v. Am. Fundware, Inc.*, 831 F. Supp.

20  1516, 1524 (D. Colo. 1993) ("Under the common law of trade secrets, '[i]f an employer pays you

21  to design, the employer owns the fruit of your labor.'"); Melvin F. Jager, Trade Secrets Law

22  § 8.01[1] at 8–2 to –3 (1993) (explaining trend of "hired to invent" cases).  Even if applicable, the

23  "hired to invent" doctrine may be superseded by the parties' agreement.  27 Am.Jur.2d

24  Employment Relationship § 182 (2011); *see ICE Corp.*, 432 F. App'x at 738, 738 n.1 (despite

25  defendants' reliance on the "hired to invent" doctrine, plaintiff independent contractor owned the

26  trade secrets based on the parties' agreements and conduct).  Here, the parties' conduct conveys

27  an agreement regarding ownership of the customer lists, and Bixby cannot likely show it is the

28  exclusive owner, if an owner at all.

18

1    In sum, the balance of the evidence before the court suggests Engstrom and Longo

2    at least partially own the customer lists they created.  Bixby cannot likely show Engstrom and

3    Longo misappropriated the information when they contacted the brokers and clients with whom

4    they had preexisting relationships.  Bixby also cannot likely show Engstrom will misappropriate

5    the information through sharing a home office with his wife, Jennifer Engstrom.  Without a

6    likelihood of success or even a "serious question" as to the merits of Bixby's claims, the motion

7    must be DENIED as to Engstrom, Longo, Jennifer Engstrom and their respective companies.  The

8    remainder of this order thus addresses only Wakefield and his company.

9            B.      Irreparable Harm

10            Having evaluated Bixby's likelihood of success, the court now turns to whether

11   denying a preliminary injunction against Wakefield would cause Bixby "irreparable harm."

12   *Winter*, 555 U.S. at 20.  An irreparable harm is one that cannot be redressed by a legal or

13   equitable remedy following trial.  *Public Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir.

14   1987).  Ordinarily, economic injury is not irreparable because monetary damages are an adequate

15   remedy.  *Rent–A–Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603

16   (9th Cir. 1991).  However, "intangible injuries, such as damage to ongoing recruitment efforts

17   and goodwill, qualify as irreparable harm."  *Id.*; *see also Stuhlbarg Int'l Sales Co. v. John D.

18   Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) (holding evidence of threatened loss of

19   prospective customers or goodwill supports a finding of irreparable harm).  Although "loss of

20   control over business reputation and damage to goodwill could constitute irreparable harm," a

21   court's finding of such harm cannot be "grounded in platitudes rather than evidence."  *Herb Reed

22   Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013).  A plaintiff must

23   "demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain

24   preliminary relief."  *Winter*, 555 U.S. at 21.

25            Here, Bixby bases its alleged irreparable harm on broader damage Wakefield

26   already has caused with its key business partner, WBS.  Mot. at 21, 24.  Although the record is

27   not clear, Bixby alleges WBS learned about defendants' departure from Bixby, experienced a

28   "loss of confidence" in Bixby's business judgment, and is now likely to offer Bixby an "inferior

19

1    commission deal" when the parties renegotiate.  *Id.*  This type of harm, if it occurred, could

2    support an injunction.  *Herb Reed*, 736 F.3d at 1249; *Stuhlbarg*, 240 F.3d at 841; *Rent–A–Center*,

3    944 F.2d at 603.  Bixby's causal story, which it clarified at hearing, is that Wakefield may

4    continue to harm Bixby's relationship with WBS by offering an alternative, cheaper client access

5    point.  As Bixby's counsel represented, Wakefield's competition could affect Bixby's pending

6    negotiations with WBS for a two-year renewal or their future negotiations.  This harm could

7    plausibly recur if Wakefield again approaches WBS using details from his prior Bixby dealings.

8            In sum, because there is a likelihood of intangible harm, this factor favors Bixby's

9    request for an injunction against Wakefield.

10       C.      Balance of Equities

11           The court next turns to evaluate the balance of equities, *Winter*, 555 U.S. at 20,

12   which here tips in Bixby's favor.  Wakefield has admitted to soliciting business from Bixby's key

13   business partner using information he acquired while working for Bixby.  An injunction would

14   prevent Wakefield from continuing to solicit such business using Bixby's commission

15   information.  Without an injunction, Wakefield may continue to undermine Bixby's relationship

16   with WBS and its other partner PEOs.  This third *Winter* factor favors an injunction against

17   Wakefield.

18       D.      Public Interest

19           "In exercising their sound discretion, courts of equity should pay particular regard

20   for the public consequences in employing the extraordinary remedy of injunction."  *Winter*,

21   555 U.S. at 24 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).  Two

22   competing public interests are at issue:

23           On the one hand, California has a "settled legislative policy in favor
             of open competition and employee mobility," protecting "the
24           important legal right of persons to engage in businesses and
             occupations of their choosing."  *Edwards v. Arthur Andersen LLP*,
25           44 Cal. 4th 937, 946 (2008).  On the other hand, the state also has a
             strong policy in favor of protecting trade secrets.  *Retirement Group*
26           *v. Galante*, 176 Cal. App. 4th 1226, 1237 (2009) ("An equally
             lengthy line of cases has consistently held former employees may
27           not misappropriate the former employer's trade secrets to unfairly
             compete with the former employer").

28

1   *Pyro Spectaculars*, 861 F. Supp. 2d at 1092; *see also Morlife*, 56 Cal. App. 4th at 1522.  In *Pyro*

2   *Spectacular*, these important and competing interests supported a limited injunction where

3   plaintiff satisfied the three other preliminary injunction requirements.  861 F. Supp. 2d at 1093

4   (granting injunction "specifically focused on preventing misuse of PSI's trade secrets to solicit

5   PSI's customers").

6          Here, the court finds a "serious question" regarding the merits of Bixby's claim

7   against Wakefield, a likelihood of irreparable harm if an injunction is not granted, and the balance

8   of equities tips in Bixby's favor.  As in *Pyro Spectacular*, the public's interest in these

9   circumstances therefore favors an injunction "specifically focused" on Wakefield's trade secret

10  misuse.

11  V.      PROPRIETY OF A BOND

12         Federal Rule of Civil Procedure 65(c) provides in relevant part that "[t]he court

13  may issue a preliminary injunction . . . only if the movant gives security in an amount the court

14  considers proper to pay the costs and damages sustained by any party found to have been

15  wrongfully enjoined or restrained."  A district court retains discretion "as to the amount of

16  security required, *if any*."  *Couturier*, 572 F.3d at 1086 (internal quotation marks and citations

17  omitted) (emphasis in original).  The court may dispense with the filing of a bond if "there is no

18  realistic likelihood of harm to the defendant from enjoining his or her conduct."  *Jorgensen v.*

19  *Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).  The bond's purpose is to safeguard a defendant if

20  the court later determines that a defendant has been wrongfully enjoined.  *Moroccanoil, Inc. v.*

21  *Zotos Intl., Inc.*, CV167004DMGAGRX, 2017 WL 319309, at *10 (C.D. Cal. Jan. 19, 2017)

22  (setting bond at $250,000 based on "tangible costs" defendant would incur due to injunction but

23  not costs it could later recoup or speculative lost profits).

24         Wakefield's argument for a bond is based on speculation alone.  WBS already has

25  declined Wakefield's proposal to lure its business from Bixby; according to counsel at hearing,

26  Bixby also is on the verge of renewing a two-year, exclusive agreement with WBS.  Wakefield

27  provides no declaration to support his bond request, and the court is left with little evidence to

28  evaluate harm should the court later determine he was wrongfully enjoined.  The court finds no

1  "tangible costs" Wakefield would incur to justify such a sizeable request.  *Moroccanoil*, 2017 WL

2  319309, at *10.

3           The court in its discretion nonetheless sets a positive security amount, finding

4  some amount is necessary to cover Wakefield's costs if he is wrongfully enjoined.  Bixby asks

5  that bond be set at a maximum of $5,000.  ECF No. 42.  Because Wakefield has provided no

6  reason to require more, the court sets the bond amount at $5,000, which is sufficient in these

7  circumstances.

8  VI.    <u>CONCLUSION</u>

9           The court confirms its GRANT of the motion for a preliminary injunction against

10  Ryan Wakefield and Freedom Risk, the terms of which the court provided in its prior order, ECF

11  No. 50.

12           The court DENIES the motion for a preliminary injunction against Michael

13  Engstrom and MEI; Christopher Longo and B&C; and Jennifer Engstrom and PEO Advisors.

14           The court confirms its ORDER that Bixby pay $5,000 as security.

15           This order resolves ECF No. 32.

16           IT IS SO ORDERED.

17   DATED:  September 21, 2017.

18

19                                          _____

20                                          UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28